**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 23 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

MARK LETTES,

      Plaintiff - Appellant,

v.

KINAM GOLD INC., a Delaware
Corporation, formerly known as Amax
Gold, Inc.; AMAX GOLD, INC.,
SEPARATION PLAN FOR KEY
EMPLOYEES; AMAX GOLD, INC.,
BENEFITS COMMITTEE; KINROSS
GOLD CORPORATION BENEFITS
COMMITTEE; KINROSS GOLD
CORPORATION,

      Defendants-Appellees.

No. 00-1057
(D.C. No. 98-S-1899)
(D. Colo.)

---

**ORDER AND JUDGMENT** *

---

Before **BALDOCK** , **ANDERSON** , and **HENRY** , Circuit Judges.

After examining the briefs and appellate record, this panel has determined

---

\*     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Mark Lettes appeals from an order dismissing his state law claims against appellees as preempted by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 (ERISA) but allowing amendment of his complaint to allege ERISA violations . He also appeals from a second order granting summary judgment in favor of appellees on the ERISA claims. Our jurisdiction arises under 28 U.S.C. § 1291, and we reverse and remand with instructions to remand to state court.

## I. Background facts and proceedings

The relevant facts are undisputed. Mr. Lettes was employed by AMAX Gold, Inc. (AGI) as a "key employee." In 1997, in anticipation of a pending merger with Kinross Gold Corporation, AGI adopted a "Separation Plan for Key Employees" (the plan) that provided an additional, one-time "golden parachute" monetary payment apart from, and independent of (but reduced by any amount paid under), the company's general severance plan. Appellant's App. at 689-705. The additional payment became owing upon a key employee's separation from service after a "change of control" as defined in the plan, *id.* at 694, and the plan automatically terminated at the close of business on December 31, 1999. *Id.* at

-2-

703. Nine key employees were eligible to participate in the plan. *Id.* at 115. AGI named itself as the administrator of the plan and initially delegated its duties under the plan to its benefits committee consisting of three members. Two of those members were eligible key employees. *See id.* at 699-700; 115-16. The committee, in turn, appointed another AGI employee as plan administrator. *Id.* at 116.

Just before the merger agreement was executed, in February 1998 the plan was amended to redefine the meaning of "Separation from Service" to include termination without cause within twelve months of the merger or by the eligible employee quitting for "Good Reason." *Id.* at 740. The amendment added definitions for "Cause" [1] and "Good Reason," [2] *id.* at 740-41, and omitted the former requirement that, in order to receive the golden parachute, the eligible employee also had to meet the terms and conditions of the general severance plan, *id.* at 741, 694. The plan further provided that an eligible employee was not

---

[1] The plan defined "Cause" as "(i) substantial and continued failure by the Eligible Employee to perform his services and duties to the Company . . . (ii) any act of fraud or embezzlement against the Company . . . or (iii) the conviction, or pleading guilty or no contest, to a felony." Appellant's App. at 740.

[2] The plan defined "Good Reason" to mean "any of the following events: (i) material reduction in the Eligible Employee's compensation, benefits, title or duties, or (ii) a change in the Eligible Employee's principal place of employment which is more than 35 miles away from the Eligible Employee's pre-Change of Control place of employment, and more than 35 miles away from the Eligible Employee's primary residence." Appellant's App. at 741.

entitled to benefits if he had been offered "Comparable Employment," as defined by the plan, by AGI or its successor. Finally, the plan specifically limited benefits to eligible employees who had performed their job assignments satisfactorily and to the best of their ability before separation; who had abided by the terms of confidentiality and noncompetition agreements; and who had executed a general release of claims in a form AGI prescribed. *Id.* at 695. Thus, under the express terms of the plan, an eligible employee was entitled to receive golden parachute benefits after separation from service unless he had been terminated with cause, as defined by the plan, or quit without good reason, as defined by the plan, as long as he also complied with prior agreements with the company and signed the release.

The plan provided a formula for benefit based on the employee's salary grade and target bonus. *Id.* at 696-99. Upon merger with Kinross in June 1998, golden parachute benefits were automatically paid without separate request or action of the benefit committee to seven of the nine "key employees." *See id.* at 117. One key employee apparently resigned and accepted a job with another company before the change of control. *Id.* Thus, Mr. Lettes was the only key employee in June 1998 who had not already been paid the severance benefit.

Before the merger, Mr. Lettes was offered a position at Kinross that AGI and Kinross believed to be "comparable employment" as defined by the plan. Mr.

-4-

Lettes disagreed, arguing that the proffered job did not provide him with the same level of autonomy, duties, or potential compensation. He requested, but AGI and then Kinross denied, the golden parachute benefits under the separation plan.

Mr. Lettes brought suit in Colorado state court, claiming that the appellees unlawfully refused to pay separation benefits to which he was entitled. Appellees removed the case to federal court under 28 U.S.C. § 1331, alleging federal question jurisdiction under ERISA. The district court then granted appellees' motion to dismiss Mr. Lettes' state law claims as preempted by ERISA. Because federal jurisdiction rests on whether ERISA controls the plan, we must answer that question first. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998).

## II. Discussion

"[C]ommon law tort and breach of contract claims are preempted by ERISA if the factual basis of the cause of action involves an employee benefit plan." *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1121 (10th Cir. 1995) (quotation omitted). We review *de novo* the district court's preliminary determination that ERISA preempted Mr. Lettes' state law claims. *Pacificare of Okla., Inc. v. Burrage*, 59 F.3d 151, 153 (10th Cir. 1995).

"ERISA was passed by Congress in 1974 to safeguard employees from the abuse and mismanagement of funds that had been accumulated to finance various

-5-

types of employee benefits." *Massachusetts v. Morash*, 490 U.S. 107, 112 (1989). "To that end, it established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator." *Id.* at 115. Although an agreement to pay severance benefits may constitute an employee welfare benefit plan subject to ERISA's regulation, the agreement is subject to ERISA's control only if it creates benefits requiring "an *ongoing* administrative program to meet the employer's obligation." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987) (emphasis added). To further explain the meaning of the term "ongoing," the Court held that, if under the agreement, the employer has not assumed a responsibility to process claims and pay benefits "on a regular basis," it "faces no periodic demands on its assets that create a need for financial coordination and control," and a benefit plan subject to ERISA has not been established. *Id.* at 12. The Court in *Fort Halifax* found that a statute requiring employers to pay as severance a "one-time, lump-sum payment triggered by a single event" did not create a benefit plan subject to ERISA's control. *Id.*

In *Siemon v. AT&T Corp.*, we stated that the *Fort Halifax* decision was primarily based on the fact that "only a one-time event would trigger the payment," noting that the Court distinguished the severance benefit from death

payment benefit plans that create an ongoing need for an administrative scheme to process claims and pay out benefits. 117 F.3d 1173, 1178 (10th Cir. 1997). Thus, we have decided that the hallmarks of an ERISA plan are whether the plan pays benefits triggered by several events, as opposed to a one-time event, and whether it requires regular periodic payments.

The district court in this case concluded that the language giving the plan administrator "complete and discretionary authority to construe and interpret the Plan, correct defects, supply omissions, and reconcile inconsistencies and ambiguities in and with respect to the Plan" also gave the administrator significant discretion in deciding whether a change of control had occurred, whether eligible employees were entitled to benefits, whether eligible employees had been offered comparable employment, and whether they had performed their jobs satisfactorily and had abided by the terms of all agreements after separation.[3] Appellant's App. at 228 (quotation omitted). Citing a Second Circuit case and focusing on its conclusion that "the making of severance payments . . . requires

---

[3] Although the plan administrator had discretion to interpret ambiguities in the plan, the language setting out eligibility requirements was explicit and absolute, thus significantly limiting the administrator's discretion. The plan set out four specific components for the administrator to use in determining whether an eligible employee had good reason to refuse an offer of employment: "material reduction" in either compensation, benefits, title, or duties. Appellant's App. at 435. The administrator's only discretion lay in determining whether a reduction in any of those four areas was "material."

the 'exercise of managerial discretion,'" the court concluded that "sufficient indicia of an ongoing administrative scheme to be governed by ERISA" therefore existed. *Id.* (citing *James v. Fleet/Norstar Fin. Group, Inc.*, 992 F.2d 463, 468 (2d Cir. 1993)). Apparently, the district court found the key factor to be considered was whether a plan required a "'case-by-case, discretionary application of its terms.'" *Id.* at 229 (quoting *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1323 (9th Cir. 1992)). We read our precedent, however, to require consideration of additional factors.

In *Bogue*, the court found an "ongoing" scheme to exist solely because the administrator had discretion in determining eligibility. There, a limited severance program similar to the one in the case at bar was created for several executives if they were not offered "substantially equivalent" employment after a merger. 976 F.2d at 1321. The employer argued that discretionary decision making was the "hallmark of an ERISA plan," and the court agreed. *Id.* at 1322. The *Bogue* court stated that it chose to follow the approach of *Pane v. RCA Corp.*, 868 F.2d 631 (3d Cir. 1989), and *Fontenot v. NL Industries, Inc.*, 953 F.2d 960 (5th Cir. 1992), in determining what constitutes an ERISA plan. 976 F.2d at 1323.

We conclude, however, that the cases *Bogue* relied upon poorly support its analysis. For example, the plaintiff in *Pane* based federal jurisdiction on ERISA but then argued that ERISA did not preempt his state law claims, which is an

-8-

inconsistent stance. *Pane*, 868 F.2d at 634-35. Without analysis, the court stated only that *Fort Halifax* "suggests" that the plan at bar was an ERISA plan because it required an administrative scheme. *Id.* at 635.

*Bogue* further proposed that the *Fontenot* court based ERISA control on whether "the circumstances of each employee's termination [had] to be analyzed in light of certain criteria." 976 F.2d at 1323 (quotations omitted). Our review of *Fontenot* leads to a different conclusion. In *Fontenot*, the plaintiff asserted that the golden parachute plan at issue was an ERISA plan, apparently arguing that *all* employee benefits requiring administrative schemes are ERISA plans and relying on *Pane v. RCA Corp.*, 667 F. Supp. 168 (D.N.J. 1987), *aff'd* 868 F.2d 631 (3d Cir. 1989). *See Fontenot*, 953 F.2d. at 962-63. *Fontenot* distinguished *Pane* by noting that the plan in its case required no administrative scheme whatsoever and stated only that *Pane* did not stand for the proposition that every golden parachute is an ERISA plan. *Id.* at 963. The *Fontenot* court did not, as *Bogue* suggests, hold that the hallmark of an ERISA plan is whether an individualized discretionary eligibility decision must be made by a plan administrator, although that factor entered into the court's analysis.

Whether a plan administrator has discretion in determining eligibility for benefits may be one factor to be considered in deciding whether an administrative scheme for processing claims is necessary, but it says nothing about whether the

plan is sufficiently "ongoing" to trigger ERISA regulation.    The fact that an administrator has even unfettered discretion in determining eligibility for benefits does not mean that the employer has assumed a "responsibility to pay benefits on a regular basis," thus causing it to face "periodic demands on its assets that create a need for financial coordination and control."    *Fort Halifax*, 482 U.S. at 12.

The district court focused on AGI's discretion in determining eligibility without examining whether the benefit also necessitated an ongoing scheme to coordinate and control monies that would fund the regular distribution of payments, as required by *Siemon.   See* 117 F.3d at 1178-79 (noting that focus of *Fort Halifax* decision was the one-time event that triggered single payment); *see also Belanger v. Wyman-Gordon Co.*, 71 F.3d 451, 454 (1st Cir. 1995) (stating that "an employee benefit may be considered a plan for purposes of ERISA only if it involves the undertaking of continuing *administrative and financial obligations* by the employer") (emphasis added).

The golden parachute agreement in this case was unfunded, contingent on a one-time event that might never happen, and expressly limited to a narrow time period. It involved only nine specific employees and the benefit was to be paid in a lump sum based on a mathematical formula.    Although there are factual differences between the statutorily-required severance payments in    *Fort Halifax* and the supplemental severance payments that AGI proposed to make to its key

-10-

employees, the reasoning of *Fort Halifax* is equally applicable to the present case and requires the same conclusion:  AGI's agreement providing for a lump-sum payment in the event of a separation after a change of control during a limited time period did not constitute an employee welfare benefit "plan" within ERISA's ambit.   Federal jurisdiction based upon § 1331 therefore must fail.

The judgment of the United States District Court for the District of Colorado is REVERSED.  The order dismissing Mr. Lettes' state law claims is reversed.  ERISA preemption is the sole basis of federal jurisdiction in this case. Therefore, the order granting summary judgment on the ERISA claims is vacated,

and we remand with instructions to remand the case to state court.

Entered for the Court

Robert H. Henry
Circuit Judge